15-1298 Mr. Black, I see you reserved three minutes for rebuttal, is that correct? Yes, Your Honor. Let me bring up an administrative type point. There's a lot of confidential markings on this brief, in the briefs, and I just want to make sure that the court does not accidentally disclose any confidential information. Do we have a problem here with that? I don't, Your Honor. I think that the confidential markings were made really out of deference to the defendant. I don't think much of the things in there that are marked confidential really qualify. Mr. Mobenfeld? Yeah, it's mostly Sprint material, but it's also Avaya material, and there's not really room here, but from Sprint's point of view, it's okay. We're okay. All right. Thank you. All right. Let's proceed then. Thank you, Your Honor. May it please the Court. The District Court erred in granting summary judgment on estoppel and laches. The District Court misapplied the law relating to these two doctrines and then failed to give all reasonable inferences in favor of High Point. In short, there were contracts between Sprint and the predecessors of the patent holder governing Sprint's license rights. Sprint cannot obtain by estoppel what it failed to obtain in its written contracts. To conclude in the face of the contracts that Sprint had established estoppel as a matter of law was plain error. The elements of estoppel are clear, a misrepresentation, reliance, and material prejudice. We can't begin that analysis until we identify the misrepresentations with specificity. What exactly was communicated? Mr. Black, let me ask you a question. So at the very outset of the development of this factual pattern that's before us, Sprint had decided to build the code division, the MDMA. CDMA. CDMA. And the CDMA was actually developed into a standards type for standardized equipment, correct? Correct. And all the parties got together and developed that standard, had a hand in it. There certainly were standards related to CDMA. I don't think there's much in the record on that issue. The standards body would like that. What was the IOS then? That was something that Sprint was developing internally. We don't really know what it is because there's no – But there were meetings of all of these parties as to the development, and it seems to me there's evidence in the record that the parties had committed to develop the IOS. We don't know anything about IOS, really, Your Honor, except for a few statements. There's a lot of statements in the record about commitments that Lucent made about the inter-vendor operability standard to build this first ever nationwide cellular network. I mean, I don't know if you can really say we have no idea what this interoperability standard was all about. We don't know what this interoperability standard that they're talking about or rely on in this case was. There was no witness who testified on what it meant. But you know what type of equipment it was? No, I do not, Your Honor. It had no relation to the patents and suits. Can you say it's all switching equipment? Switching equipment? Yes. Or maybe that's not the correct statement. It was packet switch backhaul technology. That's what was involved in the development of this inter-vendor nationwide network. There are different parts of the backhaul, some of which are implicated by these patents, some of which aren't. The record is that this particular project was not implemented in the Sprint network. If it had been, maybe you'd have to… What do you mean by this particular technology was not implemented in the Sprint network? The way the network is set up, say we're in Washington, D.C. If you call on a Sprint phone, the call will go to a base station. Maybe it's a Motorola base station at a cell tower. From there, it will go to a Motorola BSC, it's called, and then it will go into the main network. Call is completed entirely with the Motorola equipment. They have a proprietary technology for handling that link. In Chicago, you do the same thing. You're going to go entirely through Lucent equipment. There's no interoperability between the Lucent and the Motorola equipment on the backhaul link. It doesn't happen. The patents cover the link between the base station and the BSC. I think the larger point is that all the suppliers, all the bidders knew that Sprint was going to be working with and accepting bids from multiple different suppliers to build out different chunks of this network. In fact, that is ultimately what happened. All the different suppliers, including Lucent, knew that. Is that fair to say? It is fair to say that Lucent knew there were going to be other suppliers to Sprint, particularly at the time that the contracts rented into Nortel. They entered into a cross-license with Nortel that lasted 10 years. They also negotiated the contract rights with respect to IP. Why didn't that alert Sprint to the fact that maybe it's got a problem? I'm sorry? Why didn't that bring up the fact that there may be an infringement problem as a result of you having multiple companies supplying equipment for this network? Let me put it this way. Obviously Sprint was aware that it was contracting with AT&T, which had a very large portfolio. I think I said Sprint in my question. I didn't mean Sprint. Let's bring it back to PowerPoint. If the parties combined in order to create the iOS. Your Honor, we contest that fact. We contest that fact. That's a disputed fact. The iOS, there was no witness who said iOS was ever implemented in the network. Even if you think that the parties talked about some iOS standard and that they had meetings, there's no evidence it was implemented, let alone implemented in a way which touches these patterns. But there's still a larger point. Yes, maybe some very specific specifications about trying to get a Motorola base station to work with a Nortel base station controller never happened. But what did happen, what everybody knew about, and what everybody was meeting about and working together about and encouraging each other to help develop, was this overall nationwide network that was going to be made of CDMA infrastructure technology built by various different suppliers. That all, in sum, was a strong clue for Sprint that because there was all of this cooperation and efforts that everybody was working together on and benefiting from mutually, that Sprint had some reason to believe, at least according to the district court, that everybody was going to be working together to help build this network, not to create obstructions to the network. Because nobody said anything to the other party. So there's two parts to this. There's a separate interoperability project, which you've addressed. You're now addressing the broader issue, which I think really did have an effect on the district court, the idea that Lucent knows other companies might do business with Sprint. The question, though, is does that compel as a matter of law that Lucent is giving up its patent rights? And the answer to that question is found in the contracts. We cannot get around the contracts here. These were negotiated provisions over intellectual property rights. Sprint originally proposed that they would get full patent rights. They didn't get that. They have a contract which defines what patent licenses they have. It is impossible to apply estoppel. It is impossible to assert a misrepresentation, and it is absolutely impossible to assert reliance as a matter of law in the face of a contract which doesn't give them the right they now claim. This is a massive expansion of the estoppel doctrine, which goes far beyond anything this court has ever counted, and it's far beyond any case they can cite in which this court has seen, and it was done on summary judgment, and it was wrong. It was a wrong decision, and if this court affirms it, you will be massively expanding the estoppel doctrine. Are you saying it's impossible to, assuming the rights are what you say they are in those provisions, that it's impossible for a party to abandon rights through a course of conduct and dealings? The conduct, first of all, no, it's not impossible, but the conduct here occurred before the contracts were signed and there was an integration clause, and in this contract, 27.20, it says, no modifications, alterations, or waivers of any provisions herein contained will be binding on the parties unless evidenced in writing signed by duly authorized representatives. This is a 1,000-page contract between sophisticated parties. Sprint got limited patent rights. Now, why would that make sense? Sitting here today, oh, this is unreasonable. What happened if Sprint decided not to buy any more Lucent equipment in the year 2000? They started buying all their equipment from Motorola, and Motorola and other competitors are installing all their equipment in the Sprint network. Is Lucent barred from pursuing its patent rights? In addition, in 2010, after this- Perhaps if it was aware of it. I mean, Lucent and Avaya were aware that Sprint was purchasing equipment from multiple sources. None of them were infringing, though. Nortel was licensed. Motorola was not infringed. But the use of that equipment with the Lucent equipment, you're saying was an infringement. It didn't happen. There's no evidence in the record that happened. There is no infringement claim with respect to the combination of Lucent equipment with anybody else's equipment. The backhaul link is between the cell tower and the BSC. Those are always the same company's equipment. It has never, it has been a sham that was perpetrated in the district court that there's been some combination of the equipment. It didn't happen. The record evidence is there. It's cited in our briefs. Then how does the supply contract patent license apply? Because that provision, to the extent it applies, is only in reference to when you combine Lucent technology with non-Lucent technology to create some invention, and you're telling me that all the allegations of infringement are really self-contained within individual suppliers' technology. It goes to two critical points on estoppel. What the representation was and reliance. The contract says, and they negotiated for this, that the only products which were licensed were Lucent products and certain combinations. How could Sprint read that contract and conclude that it had a legal right, or how could it reasonably rely on some assumption, which, by the way, no one's testified to, they actually made, that they could go ahead and switch Motorola over from non-infringing circuit to infringing packet and not account for this? And that's your argument. And, again, it seems to me that you're arguing that Sprint could not use the license equipment in combination with equipment from other vendors. Isn't that really the crux of your argument? No, not really. But that's the prohibited activity, that Sprint was prohibited under the license from using equipment from other vendors. They were not free from infringement claims from Lucent if they decided to. The way this network was built, it was city by city. You're not answering my question, Mr. Blanton. I'm sorry, Your Honor. It seems to me that your argument is that Sprint could not use license equipment in combination with equipment from other vendors. No, they had a limited license right to do that, but they didn't exercise that here because the equipment is not working together in relation to the patents. Each city has its own. One city's a Motorola city, one city's a Lucent city, and they don't work together with respect to the patents. If there was a piece of Lucent equipment that was connected in an infringing way to a piece of Motorola equipment, maybe we'd have an issue. But we don't have that case here, and that never happened. That was never installed in the network. But I thought that's what the patent provision was contemplating. That's what we deserve. It's not clear what was contemplated in that. No one testified on it. There are other links in the network. There are other packet interfaces. There are other pieces of equipment in the network. But even if that was contemplated, it was never implemented, and there were contracts governing the interoperability work. There were two contracts, and they also preserved patent rights, and they also stated that no rights were being given up from the supply agreements. So in every single place that Lucent could have said something, they did. They negotiated with this big company. So let's get back to what you just said. The license provision at play here in your mind is that Sprint agreed to limit the sources that it used for other equipment. No. Lucent did not agree. What they agreed to do is to leave themselves open to the potential for an infringement claim down the road. What was Sprint's obligation under this provision? What was Sprint prohibited from doing? Well, they weren't licensed as a permission, so they're not prohibited from doing it. They can do anything they want. They're licensed for some subset of that. And if they go outside the license scope, they're at risk for infringement. If, for instance, they stop buying equipment from Lucent or anything happens. The main point here is this is an estoppel case, and they have contracts which govern their relationship. The reliance has to be proved. Who relied on what? Nothing's said here. It's all written by the lawyers. There's not real evidence in this case. And the idea that Sprint relied on a provision outside a contract or that it can go beyond its contracts is just not right. That's our submission. Thank you. Mr. Lobenfell. Good morning, Your Honors. May it please the Court, Eric Lobenfell, Hogan Lovels v. Sprint. When Sprint had the idea to have the first cellular network in America, it did not want to do it alone, and it didn't want to do it with a single supplier. It reached out to Nortel and Motorola and to Lucent, and it said, guys, I want you all to come together. Here's a term sheet. I want you to all work together, and I want you to come up with standards for having this equipment work together. And if you walk anywhere or drive anywhere in America, all of this equipment works together if you have a Sprint phone. What about the patent license and all the supply contracts where apparently Lucent retained certain rights against Visa v. Sprint? Our position, as the district court found correctly, we believe, is simply this. Putting that in the contract is the same as sending a letter saying, I have patents, you infringe, and then not doing anything for 10 years. If, in fact, the license means what Mr. Black says they are, then, in effect, Lucent was saying, in effect, I reserve my right forever to sue you for infringing products even when I work together with all these alleged infringers who I know are taking billions of dollars out of my pocket. Well, I guess those provisions were written in the supply contracts that were written and entered into contemporaneously with all of these discussions going on about an interoperability standard. So I guess what I'm wondering is couldn't that be sufficient notice to Sprint that Sprint has to recognize that these statements that they are agreed to in contracts should put them on notice? Well, it put them on notice that Lucent had patents, and then it sat down with Lucent for years and years and years, and again, this is not silence. This is not Lucent, you know, there was nothing in the way of misleading conduct or what have you. There's pages and pages and pages of sites in the brief, as your honors have pointed out, in which Lucent committed in writing to working with the alleged infringers in the Sprint network while Sprint spent billions of dollars on equipment that it claimed years later to be infringing, and respectfully, that trumps, as a matter of equity, an equitable estoppel in this court's case law, that trumps whatever that language means. You know, Lucent joined our brief. There's no testimony from anybody from Lucent or from Avaya that said, you know what, yeah, we put that in there and we did it for a reason and here's why we didn't sue. So Lucent, whose conduct is mostly at issue here, is signed on to our brief and agrees with our understanding of the facts and the implications that you draw from those, which are undisputed. I mean, and Avaya retained an interest in this case when they sold the patents to Highpoint. So Avaya had every interest of joining Highpoint and putting up a witness to say, well, gee whiz, you know, we didn't know that they were infringing or we didn't infringe for some reason that might excuse the delay. But Avaya didn't do that. Highpoint argues that there wasn't any infringing activity going on during the time that Lucent owned the patents. Well, that's simply not true, Your Honor. When they sat down in 1995. Nortel had a license. They didn't until 1998. When the equipment went into the ñ when the Nortel license was signed with Sprint, that was an act of infringement January 96. When the Nortel equipment went live in the Sprint network in early 97, February 97, it's all in the brief and in the record, that was infringement. The license with Nortel wasn't signed until October of 98. When did the Samsung equipment go into Puerto Rico? So that's another example, Your Honor. The bidding process for Samsung for Puerto Rico went out in 99, and Lucent still owned the patents in 99. The bid was awarded to Samsung in 2000, just about the time the patents were spun off. This is all a matter of public record. Lucent knew that Samsung was bidding for this job, and Lucent knew that Samsung got the job. They had an obligation under this court's opinion, the Juan List opinions by Your Honor, Judge Mayer, to investigate and put Sprint on notice before Sprint spent billions of dollars putting this out. Now, he says there's no reliance. We have testimony. One of the problems Mr. ñ that Highpoint has is they have no testimony. Even Avaya, who was aligned in interest with them, they testified that they never considered suing a customer. No, people don't sue customers. That even when they got around to considering ñ The testimony has to come from you, right? This is your defense. You have to prove, and it's ultimately whether Sprint detrimentally relied on whatever conduct by Lucent, et cetera. Yes. So it's up to you to prove. Absolutely right. So we had two witnesses. Right. Who seemed to say, oh, Sprint could have done X, Sprint could have done Y, Sprint could have done Z, but to be reliant doesn't have to be would have done something? I don't think so, Your Honor. I think in the Aspects case, this court made clear that you don't have to identify with specificity exactly what you would have done, only that you had options, which if you had been given the notice that we think certainly Lucent should have done here if they had any intention of enforcing the patent, which they didn't have, and that is, number one, there's an alternate technology to cDNA called GSM. It's used all over the world. Our head of IP at Sprint testified that that was an option they considered, and it wouldn't have infringed, and if Lucent had spoken up at the time, that's something they could have done. They could have bought all the equipment from Lucent, right? All the patents. Lucent was the largest supplier. It was easy enough to just, you know, if Lucent had spoken as they should have, if Lucent had said you can't work with those guys because they're going to infringe and you're going to be sorry and they're going to be sorry, we could have said, okay, license them, or we could have said Lucent will buy it all from you, and we wouldn't be sitting here today. But Lucent didn't do that, and they didn't do it not because they were lying. Does that count as economic prejudice? Yes. Because, you know, right now the prejudice you have to suffer is maybe having to pay royalty damages on a license that you never got in the beginning, but if you're saying what you would have done is just you would have gotten a license 10 or 15 years ago, it kind of sounds like the same position. It isn't, Your Honor, respectfully, and I'll tell you why. What this Court's cases say is that incurring damages for patent infringement may be a type of economic prejudice in a case like this where you change your position in reliance on the conduct. If you would have been in a different position had the patent owner spoke up at the appropriate time, and here in 95 and 96 and 97 when all these discussions and the actual infringement by Nortel was going on, we could have done something else. And so to the extent Sprint would have to pay damages in this case, that is incurring damages because we made a change in economic position, and that's exactly what this Court's cases say. I mean, Aukerman says that. The only case that they rely on, that state contracting case, the Court found as a factual matter there was no evidence that there was anything else they would have done or could have done, and so therefore the only damage, economic prejudice in that case was that they might have to pay damages for patent infringement. That's not the case here. We could have just bought it all from Lucent, and that would have been that. And our people testified to that. The fellow, the partner at Wilkie Farr and Gallagher who negotiated all these contracts with Lucent and Nortel and then Motorola and the head of IP at Sprint who said they considered these other technologies and if the patents had been raised could have done it differently, and that respectfully is what your cases say constitutes economic prejudice when you make a change in position as a result of the silence or the misleading conduct. So the prejudice, the evidence of reliance, he says there's no evidence. We have sworn testimony by the two people who were there and did these deals and who made the judgments at the time, and they have no testimony from anybody. The testimony on prejudice as to what else we could have done to avoid where we are now if we had been alerted by Lucent at the time came from the people who were there and did it. They have no testimony. And I mentioned Avaya, Your Honor. I know it's later in time, but I mention it because, and I've said this, but I think it's telling. If High Point wins, Avaya wins. They didn't say anything that helps High Point in this case. They only said things that helped Sprint. They said Sprint is a valued customer, Sprint is an ongoing customer, and that they never considered suing carriers and wireless carriers like Sprint. They only considered suing unlicensed equipment people like Motorola and Samsung. And what's my point? That nobody who owned the patents during the relevant time intended to enforce them, told us that they enforced them, did all of the things that we talked about in the record, pages and pages of documents and quotes swearing a blood oath almost from Lucent. We understand Sprint that you're going to work with everybody. Internal Lucent documents showing the Nortel equipment and the Lucent equipment in the network together, internal Lucent documents showing Nortel equipment and Motorola, if I said it. What about the 2000 interoperability agreement that referenced the supply contracts and obtaining all rights and obligations? Well, the interoperability agreement, it says the provision of hardware or software to one party by the other does not convey to the receiving party any intellectual property rights and such hardware or software, other than Sprint or its designee's right to use any such equipment and software provided here under for the purpose contemplated herein. So it's and that's in the record at 21080. So the documents show Lucent's internal documents at the time in 96 and 97 and 98 show everybody's products working together. Lucent had an infringement claim against Nortel in 1996 when Nortel signed the contract with Sprint and indeed the Nortel contract was signed before the Lucent contract. It's all a matter of public record and known to Lucent and they never said boo and if they were going to enforce their patents, whatever that contract says. It's just like saying, just like sending a letter, just like saying I have patents, you may infringe these patents and then doing nothing for 10 years. And then you say, well, you know, let's suppose the letter says and I reserve my right to get to go after you whenever I feel like it. We wouldn't be having this respectfully. I don't think we'd be having a conversation in which, you know, the adversary can stand up and say, yeah, I know it was 10 years ago, but the letter says I reserve the right to sue you anytime I wish, so you shouldn't have relied on it. The cases say the conduct, if the conduct lulls the infringer into a sense of security that the patents will not be enforced against him, that is the misleading conduct and that's absolutely the case here in Spades as the special master found it as. Thank you very much. Thank you. Mr. Black, you have three minutes. Thank you, Your Honor. Your Honor, there's a theme running through the argument in the district court and which was just made here is that it would be completely unreasonable for Sprint to have agreed to this, that they must have been duped into doing something against their will. They would never leave themselves open to potential claims by a supplier like Lucent in relation to equipment that they installed in their network. But I direct the court to Page. What prompted the silence then? I mean, if all this time passed and Lucent from the very beginning, once they saw that Sprint was going out and obtaining equipment from other suppliers, why didn't Lucent at that point send them a letter or raise an issue? Well, it was well known to everybody, I'm sure, that AT&T had a large patent portfolio in this space. The specific infringement, there's no evidence it was investigated or that anybody knew about it. And, in fact, early in the implementation of this business, AT&T entered into a cross-license with Nortel. No one else used packet-based technology until years later. And the real infringement in this case began in 2004 when Motorola switched from circuit to packet, which was long after the fact. How about the Samsung project? Samsung was a very small implementation in Puerto Rico. It was less than one percent. What year was that? That was 2001. It was 2001, which was after they transferred the patent. And that was clearly using non-licensed equipment. The equipment was not licensed, but nobody knew what was in it. I mean, this isn't stuff you can buy off the shelf. But even if they did know, the interoperability project wasn't going on at that point. There's no evidence this project was going on. I want to point out that this whole thing is about sort of equity, as my opposing counsel says, that this could never have happened. It's unreasonable. But A13470 in the record is the page of a contract entered into between Lucid and Sprint after this case began and before the patents expired. And it explicitly says, subject to the restrictions in this agreement, supplier, that's Lucid, may pursue money damages from Sprint or a third party for any infringement of supplier's intellectual property. So Lucid today has... But here we're looking for something more than that. We're not looking for a statement that I have a right. We're looking for the statement that says I'm going to assert that right. Well, I don't believe that there's any requirement that parties search their patent portfolios and identify claims. It's really very difficult to do. But the question here is estoppel. So there had to be a misrepresentation. If the misrepresentation is supposed to be that Lucid would never sue Sprint in the future based on the installation of third party equipment, well, that representation wasn't made because the parties had contracts that were integrated which described exactly what rights Sprint was getting. Or it could be misleading conduct. It could be misleading conduct, but I don't think in the face of the contract it could be. And more importantly... But when there's no conduct that enforces that provision and all these years go by and there's just simply nothing there. Well, we're only chargeable with the conduct of Lucid during the time period they held the patent, which was until 2000. After that, we can't be charged with estoppel. There was no contact. But in the end, we're looking at estoppel from the perspective of Sprint. And, you know, from Sprint's perspective, from 1995 to 2008, it had no clue about these four patents. And it had no idea that anybody was going to come after them after these four patents. All it knew was that all of these different suppliers were working with Sprint to build out this very, very gargantuan, expensive network. And if it was really in someone's interest to get some kind of recovery from the patent rights, the whole point is, why should Sprint have to wait until 13 years later? Well, what's charged, though, is estoppel. And there are clear requirements for estoppel. There has to be a misrepresentation, which has got to be more than not saying something about patents that you have. And there has to be reliance. And I respectfully disagree that there's any evidence in this record of a competent witness on reliance. They never had anybody come forward and say what they would have done differently, how they would have... If they would have bought all the equipment from Lucent, they would have presumably paid a lot of money for that. The only witnesses they proposed on that topic were a lawyer who negotiated the very contracted issue and the intellectual property provision, who, of course, is incompetent to that foundation, and a patent lawyer at the company. Nobody who was in charge of equipment purchases, nobody who can talk to the bargaining leverages between AT&T and Sprint or how things work in the real world. The fact of the matter is Lucent today has a claim for patent infringement against Sprint for use of Nortel Motorola equipment, whatever, from 2010 on. It's written right here in the agreement. That was fair. They agreed to that themselves after this case was filed. But yet we're barred, even from that time period. You want to conclude? Yes, Your Honor. I think that this case marks a massive expansion of the estoppel doctrine. And if affirmed in any way, we'll create massive mischief in the marketplace. Parties do business with each other all the time. IBM, Cisco, all these gigantic companies, they do business with everybody. And if the charge is that if you do business with somebody and we don't bring a claim and then you do business with our competitor and we sue you, then you're out of luck on estoppel. That's never been the law. Thank you. Thank you.